Auburn Exchange Bank *v.* Fitch.

---

---◆---

## THE AUBURN EXCHANGE BANK *vs.* MORELL S. FITCH and others.

A man confessedly in embarrassed circumstances, and, as the result shows, insolvent, seeing that a firm of which he is a member must probably fail, may lawfully appropriate his private property to the payment primarily of his private debts, in preference to the partnership debts, by conveying and transferring such property to his private creditors, in payment of their just demands; and such conveyances and transfers will be valid; where there is nothing to impeach the good faith of the grantees, or tending to show that they were privy to any concealment or fraudulent intent or purpose on the part of the grantor, in disposing of his property.

An individual may, at all times, convey or turn out his property in payment of his just debts; and this is none the less true because he is straightened in his circumstances, and unable to pay all his creditors.　At such times he may honestly prefer one creditor to another; and if he sells and conveys his property for a fair price, in payment of just debts, the legality of the conveyances or transfers cannot be questioned.　Fraud cannot be predicated upon such a transaction, on the assumption that the debtor meant to defraud his creditors.

An intent on the part of the grantees to defraud, or to concur in, or aid in carrying out or consummating any fraud on the part of the grantor, cannot be imputed or inferred from the fact that such grantees did in fact receive transfers of all the property of the grantor, and must have known that his other creditors could not be paid.

The law is not so unjust as to forbid a son from paying an honest debt to his mother, by a conveyance to her of his family residence; nor is it so unreasonable as to require her to turn her son into the street, at the peril of losing the estate.　*Per* E. D. SMITH, J.

THE action was brought to set aside several deeds of conveyance of real estate, by the defendants, Morrell S. Fitch, and Laura his wife, to the defendant Mrs. Masters; a chattel mortgage by the said Morrell S. Fitch, to the said Elorsey S. Masters; a transfer of stock in the Auburn Gas Company, by the said Morrell S. Fitch to his wife, and a subsequent transfer thereof by her to the defendant James C. Reed; and transfers to either of the other defendants; and a general assignment by Curtis Hemingway, a defendant, and the said Morrell S. Fitch, to Elmore P. Ross, for the benefit of creditors, on the ground that said conveyances, &c. were made to defraud creditors; and for other relief. The plaintiff was a judgment creditor of Hemingway & Fitch. On and previous to the 8th day of April, 1864, Fitch & Hemingway were partners, and on that day they were insolvent, both jointly and severally. On that day Fitch conveyed all his real estate to his mother, Elorsey S. Masters, and on the same day he executed a chattel mortgage to her upon all his tangible personal property. These deeds were not recorded, nor was the chattel mortgage filed until September 19, 1864. Fitch also at or about the same time transferred his stock and other evidences of debt, mostly to his mother, but a part to his wife, who soon after sold to James C. Reed; having thus disposed of the title to all his property, both real and personal, but still continuing in possession. Fitch united with Hemingway, on the 17th of September, 1864, in making an assignment of all their property *both joint and several* to Elmore P. Ross, who accepted the trust and took possession of all the property included in the schedule annexed to the assignment. This assignment was in fact not only made with the knowledge of the plaintiff, but its provisions were dictated by its president. After the assignment was made, and before this action was commenced, the assignee commenced an action to set aside these same conveyances and transfers. Why the action by the assignee was not prosecuted does not appear.

The making of the assignment is set out in the complaint in the present action, wherein it is alleged as follows : " And the said plaintiff further says, that although more than two months have elapsed since the execution and delivery of said assignment, no property, nor evidence of property whatever of the individual property of said assignors, has passed to the possession or control of said assignee, named in said general assignment. Nor, with the exception of a safe, and some office furniture of trifling value, has said assignee received into his possession, or under his control, any property, or evidence of property from the assets of said firm. And the said plaintiff further says, upon information and belief, that said instrument of assignment was prepared by the said Pingree, and executed and delivered by the said Hemingway & Fitch, not with the honest purpose of distribution through said assignee, of the proceeds of their joint and individual property in the payment of their debts, according to the priorities established in said assignment, but as the closing act of a contrived conspiracy on the part of said Hemingway, Fitch and Pingree, of which the acts and circumstances hereinbefore stated, are parts, to defraud the creditors of said assignors, and to hinder and delay them in the collection of their just debts." The prayer in relation to the assignment is as follows : That " the said instrument of assignment or deed of trust so executed by the defendants, Curtis Hemingway and Morell S. Fitch, to the defendant Elmore P. Ross, may be declared to be fraudulent and void as against the plaintiff in this action, and may be set aside and vacated as such," &c.

Proofs were taken, but no proofs tending to show that Fitch & Hemingway or either of them had any property of which the assignee could have taken possession, or in any wise obtained, except through the action of this court. The defendant Ross, (the assignee,) answered, claiming all the property (if any) which had been fraudulently disposed of by his assignor Fitch.

The cause was tried .before Justice JAMES C. SMITH, at special term. He found · that the conveyances of the real estate, and the transfer of his personal property by Fitch, were made to hinder, delay and defraud his creditors. The court then declares as matter of law " that said assignment * * * is valid, and said Ross as assignee, is entitled by virtue of its provisions, to all the property of said Hemingway & Fitch, or either of them, (including that covered by said transfers and conveyances,) herein declared void (excepting the stock purchased by said Reed of Mrs. Fitch) and including also the avails of said stocks received by Mrs. Fitch for the purpose of the trust expressed in said assignment ; and a judgment may be entered, directing said Curtis Hemingway, Morell S. Fitch, Elorsey S. Masters, Laura Fitch and John T. Pingree, and each of them to deliver to said Ross as such assignee, all property in their hands, respectively covered by said transfers, or either of them, and the proceeds and avails thereof in their hands, and perpetually restraining them, their attorneys and agents, 'from making any other disposition thereof." Appeals were taken by the following parties : (1.) By Morell S. Fitch and Laura Fitch his wife ; (2.) By Elorsey S. Masters and John T. Pingree ; (3.) By the plaintiff the Auburn Exchange Bank.

*D. Pratt,* for the plaintiff.

*T. R. Strong, Geo. Rathbun* and *D. Wright,* for the defendants.

*By the Court,* E. DARWIN SMITH, J. The judgment rendered at special term, adjudging that the several conveyances and transfers therein mentioned from the defendant Morell S. Fitch to the defendants Elorsey S. Masters, Laura Fitch and John P. Pingree, including the chattel mortgage also therein mentioned, were fraudulent and void, and directing that the same be set aside, vacated and annulled, was based

upon an express finding of fact in which the learned judge finds "that the said several conveyances and transfers were executed by the said Fitch with intent to hinder, delay and defraud the creditors of the firm of Hemingway & Fitch, (of which the said Fitch was a member,) in the collection of their debts, and were accepted by the said Elorsey S. Masters, Laura Fitch and John P. Pingree, with the like intent."

The legal conclusion drawn by the learned judge from the facts he found was clearly correct, and we are therefore called upon to examine the evidence in the case and see if the said findings upon the facts, as contained in the decision at special term, were authorized or warranted by such evidence.

The several conveyances and transfers thus set aside by the judgment, at special term, were all professedly made in consideration and satisfaction of debts claimed to be justly due and owing to the said respective grantees or vendees of the property, from the said Morell S. Fitch.

In the decision at special term nothing is said about these debts, but in the opinion of the learned judge he says that he had not thought it necessary to decide whether the claim of Mrs. Masters was an honest and valid debt for its full amount, at the time of the transfer. He thought it probable that she had a valid debt originally, but that there was much evidence tending to show that a large portion of it had been paid.

If the learned judge had considered the evidence relating to the validity and justness of these several debts in payment of which the property in question was conveyed or transferred to the several grantees or vendees thereof, and had found, as a matter of fact, that such debts in whole or in part, or any or either of them, were fictitious or trumped up for the occasion, his finding that the said transfers to pay such debts were fraudulent would have been well founded and most incontestible.

But in the absence of any such finding, and upon the concession or assumption that said debts are valid and justly

due and owing to the several parties as claimed and asserted by them, very different rules and principles apply in the review of the question of fraud asserted in such decision. Upon the facts, as they appear in evidence, it seems to me that the debts to Mrs. Masters, to Mrs. Fitch and to Pingree, and to each and every one of them, are clearly established to be honest, just and valid for the full amount thereof, respectively claimed by them. The proof is clear and explicit on this subject, and I do not think it could be found or held otherwise with any degree of fairness.

The existence and validity of the debt of Mrs. Masters is fully proved by herself, by her husband and by Fitch, and there is no evidence in the case to impeach their testimony on this subject, or their credit as witnesses. The debt of Mrs. Fitch is also conclusively proved to have been hers, and to have arisen from her separate property; and the debt of Pingree for professional services and expenses clearly exceeded the securities received by him from Fitch.

Assuming that the said deeds and transfers to Mrs. Masters, Mrs. Fitch and to Pingree were thus given for honest and valid debts, they may nevertheless be held fraudulent and void, and the question of fraud is one of fact; but as, in this view, they are deeds to purchasers for a valuable consideration, the statute declares that they shall not be affected or impaired for any fraud of the grantor or vendor, unless it shall appear that such purchaser had previous notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantee. (2 *R. S. p.* 137, § 5, *title* 3, *ch.* 8.   21 *N. Y. Rep.* 168.   17 *id.* 28.)

We see, then, that the import of the finding at special term is that these deeds and transfers were made to hinder and defraud creditors, and that the grantees were privy to such fraud. In this view of the force and effect of the findings upon the facts at special term, that these deeds and transfers were made and executed with intent to hinder, delay and defraud the creditors of the firm of Hemingway &

Fitch, I think it cannot be sustained, and is not warranted by the evidence.

Morell S. Fitch, at the time of making these conveyances and transfers, was confessedly in embarrassed circumstances, and, as the result shows, clearly insolvent. He owned and had in his possession a large amount of property. The firm of Hemingway & Fitch was greatly extended, and in desperate circumstances, and it was through the losses and embarrassments of this firm that Fitch was straightened, and not from any difficulty in his private affairs. Seeing that the firm of Hemingway & Fitch must probably fail, Fitch, early in the spring of 1862, evidently began to prepare for that event, and determined, it seems, to appropriate his private property to the payment, primarily, of his private debts in preference to the partnership debts. With this view and intent, he made the conveyances and transfers in question, conveying his property to his private creditors in payment of these honest debts. He made and delivered the deeds and transfers on the 8th of April, 1862, and apparently remained in possession of the real estate and household furniture for several months afterwards. It appears that the firm of Hemingway & Fitch floundered along during these several months, when they finally failed, and that during this period Fitch had more or less the hope and expectation that the firm would recover from its embarrassments and sustain itself and go on, and spoke of it and of his own affairs, on some occasions, as though he was the owner of all his private property. So far as Fitch is himself concerned, these facts present about all there is in the case tending to show that he had any fraudulent purpose in disposing of the property. But so far as relates to the grantees in these several conveyances and transfers, there is nothing to impeach their good faith; really nothing, fairly considered, tending to show that they were privy to any concealment or fraudulent intent or purpose on the part of Fitch in disposing of his property.

The deeds to Mrs. Masters were executed and delivered on

Auburn Exchange Bank *v.* Fitch.

the 8th of April, and she testified that she then put them in her safe, and that they remained there till about the first or second of September afterwards, without any design or concert for that purpose, but by mere heedlessness and accident. She let her son remain in her house because he was her son, and had nowhere else to live. She had a perfect right so to do. The law is not so unjust as to forbid a son from paying an honest debt to his mother by a conveyance to her of his family residence; nor is it so unreasonable as to require her to turn him into the street, at the peril of losing the estate. In respect to the gas and telegraph stock transferred to Mrs. Fitch, it appears that the gas stock was purchased with her money, and that she always had the scrip, although it was issued, when first purchased, in the name of Fitch, that he might be a director in the company. Mrs. Fitch had the possession of this scrip before its transfer to her on the books, on the 8th of April, and the new scrip issued in her name was immediately delivered to her, and the telegraph stock was transferred at the same time, and the scrip issued to her. The property transferred to Pingree was choses in action, and was immediately delivered to him, and kept by him as his own. Possession of all the property transferred by Fitch was immediately delivered, and a continued change of possession thereof followed, except in respect to the real estate conveyed to Mrs. Masters, and the property conveyed by the chattel mortgage. The personal property embraced in the chattel mortgage stands upon a somewhat different footing from the other property. Possession not having been taken under it immediately by the mortgagee and continued, the law presumes it fraudulent; and it may be that the creditors might hold this property. The legal presumption against its validity is some evidence on that point, and if it stood alone, and was unconnected with the other property, the finding of fact distinctly declaring it fraudulent, perhaps, could not be disturbed.

Aside from these facts relating to possession of the property,

there is, it seems to me, really no evidence in the case tending to prove that Mrs. Masters, Mrs. Fitch and Pingree, received the conveyances and transfers by them respectively, with any intent to defraud, or with any knowledge or notice that the said Morell S. Fitch had executed said conveyances and transfers with intent to defraud his creditors.

They all deny such knowledge or intent. Mrs. Masters, Mrs. Fitch and Pingree, respectively expressly deny that they had any notice or knowledge of any intent on the part of Fitch to defraud his creditors, and he denies also that he had any such intent. Mrs. Masters testifies that " she did not know or think that Morell was going to make an assignment, or was unable to pay his debts." Masters, the husband of the defendant Mrs Masters, who took the deeds and transacted the business for his wife, with Fitch, testifies that when he was making the deeds he did not know but that he (Fitch) could pay every debt he owed, and more too. He had no suspicions that any thing was wrong. He says, " I handed the deeds to my wife, and she put them in her safe. My wife spoke to me once or twice about having them recorded, but it was neglected by carelessness." So far as particular intent on the part of the grantees in these deeds and transfers to defraud, or to concur in, or aid in carrying out or consummating any fraud on the part of Fitch in making these conveyances, is concerned, I think it is completely and entirely disproved, except so far as such intent may be imputed or inferred from the fact that these several grantees did in fact receive transfers of all the private property of Fitch, and must have known that his other creditors could not be paid. They must all have known, his mother, perhaps, least of all, that he was straightened and embarrassed in his circumstances, and feared that he would be unable to extricate his affairs, and go on with his business. His offer to convey and transfer his property in payment of his private debts implied this, and was of itself notice of his embarrassments. A man does not ordina-

rily propose to transfer all his property to his creditors without some apparent occasion or necessity.

But nothing is clearer than that a man may at all times convey or turn out his property in payment of his just debts; and this is none the less true, because he is straightened in his circumstances, and unable to pay all his creditors. At such times he may honestly prefer one creditor to another, and if he sells and conveys his property for a fair price in payment of just debts, no one can question the legality of the conveyance or transfer. There is, there can be, no fraud in such a transaction. Fraud cannot be predicated upon it, on the assumption that the debtor meant to defraud his creditors. There is no fraud in the case, if the property in fact goes to pay and satisfy an honest debt. A creditor in such case will ordinarily be anxious to get his pay when his debtor's circumstances are most desperate, and his anxiety and efforts for that purpose will naturally be in proportion to the desperateness of the affairs of his debtors and the danger there is of the entire loss of his debt.

I know it is said in some of the cases, and is said in the opinion of the learned judge at special term, that a transfer may be fraudulent though made to pay an honest debt, and *Twyne's case,* (3 *Coke R.* 80,) *Waterbury* v. *Sturtevant,* (18 *Wend.* 353,) and *Hanford* v. *Artcher,* (4 *Hill,* 271,) are cited in support of this doctrine.

In *Twyne's case,* Twyne took a conveyance of all his debtor's goods, without exception, and left them in possession of the vendor, who continued to use, sell and manage them as his own. It was a case of personal property clearly sought to be covered up by a sham sale. The case of *Hanford* v. *Artcher,* was also a case of personal property, and the question arose under our statute in regard to the sale of personal property, the vendor remaining in possession. The case of *Waterbury* v. *Sturtevant,* was the case of a sale of land in payment of a debt, and the court for the correction of errors

reversed the chancellor's decree, and held the payment good and the deed valid.

The proposition, nevertheless, is in a certain sense true that a man having an honest debt may so use it to aid his debtor in a dishonest scheme of covering up and concealing his property as to render a conveyance to him in apparent payment of such debt fraudulent. But it must be when it is used as a mere cover or instrument of deception, and with intent to keep much more property than the creditors get by the conveyance, or much more in value than his debt from the other creditors. But I deny the proposition that a conveyance by a debtor to his creditor in payment of an honest debt at a fair price, can be impeached for fraud, because some other creditor will lose his debt. It is a perfect absurdity to say that a conveyance of property which pays one's creditor, and nothing more, and pays him a just debt, can be fraudulent as against other creditors of the common debtor.

If a man purchase property of a debtor to aid him to get it into money or choses in action, thereby more easily to hinder and delay or defraud creditors, or take a mortgage on a large amount of property, with the view and design to cover it up so as to hinder the creditors of the mortgagor, such conveyance may doubtless be avoided for fraud.

This is the precise case stated by Senator Edwards, in *Waterbury* v. *Sturtevant*, (*supra*, 364.) In stating the rules in such cases, he said, " I admit that if the property is sold for the purpose of preventing or delaying the collection of a debt, and the purchaser, knowing the facts, makes the purchase for the purpose of aiding that intent, the sale is fraudulent, although a fair consideration is paid." This is not the case of a conveyance made and received in payment of an honest debt. In the race of creditors to get payment of their respective debts from their common debtor, who cannot pay all, each creditor will and may look out primarily for himself, and if he gets or takes no more than a fair and reasonable amount of his debtor's property, and takes and receives it in payment

and satisfaction of his debt, his title thereto cannot be impeached. He is not obliged to look out for other creditors, or to consider whether they will or will not get their debts. There can be no fraud in his getting his own debt, if he takes no more than the pound of flesh, whatever may happen to other creditors of the common debtor.

In this case, I think it clearly appears that the property conveyed by Fitch to Mrs. Masters, Mrs. Fitch and Pingree, was transferred in payment of honest debts, and at nothing more than a fair price, and I do not see how those transfers can be impeached. At least, I think the judgment setting them aside erroneous, and that the same should be reversed.

As this view of the case necessarily involves a new trial, I do not think it necessary or expedient to discuss any other questions in the case.

The judgment should be reversed, and a new trial should therefore be granted, with costs to abide the event.

[Monroe General Term, March 4, 1867. *Welles, E. D. Smith* and *Johnson,* Justices.]